ROBERT MORAN *v.* EASTERN EQUIPMENT
SALES, INC., ET AL.
(AC 22273)

Foti, Dranginis and Bishop, Js.

---

Argued January 16—officially released April 8, 2003

*Scott L. Haworth,* pro hac vice, with whom were *James Somers* and, on the brief, *Christopher Lynch* and *Bonnie Schinagle,* for the appellant (defendant Case Corporation).

*William T. Blake, Jr.,* for the appellee (plaintiff).

*Opinion*

BISHOP, J. The defendant Case Corporation (Case) appeals from the judgment of the trial court, rendered after a jury verdict, in favor of the plaintiff, Robert Moran.[1] Case claims that the court improperly (1) refused to set aside the verdict on the basis of General Statutes § 52-577a, (2) refused to direct a verdict in favor of Case and grant its motion to set aside the verdict on the question of design defect, (3) refused to grant Case's motion to set aside the verdict on the question of failure to warn, (4) admitted the testimony of the plaintiff's expert, (5) admitted as exhibits an operator's manual and parts catalog, and (6) instructed the jury on the issues of warnings and proximate cause. We affirm the judgment of the trial court.

The jury could have reasonably found the following facts. On December 20, 1993, the plaintiff purchased a W24 wheel loader, manufactured by Case, from Eastern Equipment Sales, Inc. (Eastern). The purchase price was $12,000. Eastern and Case had a distribution agreement under which Eastern sold Case products and provided product support for Case products.

On January 8, 1994, while the plaintiff was working in a plaza removing snow with the W24, he moved a fuel truck next to the W24, removed the engine cover

---

[1] The named defendant, Eastern Equipment Sales, Inc., has not appealed from the judgment. We therefore refer in this opinion to Case as the defendant.

and placed it on the ground, and, with the W24's engine still running, ran a hose from the fuel truck to the fuel fill inside the W24's engine compartment to refuel the W24. When he was finished, he replaced the cap on the fuel fill and returned the hose to the fuel truck. He next reached down with his left hand to retrieve the engine cover while resting his right hand near the fuel fill. The plaintiff then slipped and his right hand went forward. Hearing a "thump, thump" noise, the plaintiff pulled his hand back, saw that his glove had been shredded and that he had sustained an injury. A coworker then took him to a hospital, where Paul Fischer, an emergency room physician, performed a procedure on the plaintiff's hand requiring the amputation of the right index finger while saving the right middle finger. Fischer later testified that the cause of the plaintiff's injury was contact with the W24's engine fan blade.

The plaintiff subsequently brought an action against Eastern and Case under the Product Liability Act, General Statutes § 52-572m et seq. Case denied liability and asserted twelve special defenses, including numerous specifications of contributory negligence and misuse. The action was tried to the jury beginning on July 6, 2001. On July 17, 2001, the jury returned a verdict in favor of the plaintiff in the amount of $12,000 in economic damages and $200,000 in noneconomic damages. The jury assessed liability finding the plaintiff to be 25 percent responsible, Eastern to be 50 percent liable and Case to be 25 percent liable. The court rendered judgment thereon. On July 26, 2001, Case filed a motion to set aside the verdict, which the court denied on August 15, 2001. This appeal followed. Additional facts will be set forth as necessary.

I

Case's first claim is that the court improperly refused to set aside the verdict against Case on the basis of § 52-

577a.[2] Specifically, Case claims that because it parted possession with the W24 more than ten years prior to the plaintiff's injury, the plaintiff was required to and failed to prove that the W24 was within its safe and useful life, as provided in § 52-577a (c), at the time of his injury. Case further contends that § 52-577a (c) provides five considerations for the court to determine whether a product is within its safe and useful life, and that the plaintiff failed to present proof as to any of those factors. We disagree.

"[T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Internal quotation marks omitted.) *Bolmer* v. *McKulsky*, 74

[2] General Statutes § 52-577a (a) provides in relevant part: "[N]o such action may be brought against any party nor may any party be impleaded pursuant to subsection (b) later than ten years from the date that the party last parted with possession or control of the product."

Section 52-577a (c) provides in relevant part that "[t]he ten-year limitation provided for in subsection (a) shall not apply to any product liability claim brought by a claimant . . . provided the claimant can prove that the harm occurred during the useful safe life of the product. In determining whether a product's useful safe life has expired, the trier of fact may consider among other factors: (1) The effect on the product of wear and tear or deterioration from natural causes; (2) the effect of climatic and other local conditions in which the product was used; (3) the policy of the user and similar users as to repairs, renewals and replacements; (4) representations, instructions and warnings made by the product seller about the useful safe life of the product; and (5) any modification or alteration of the product by a user or third party."

Conn. App. 499, 510, 812 A.2d 869, cert. denied, 262 Conn. 954, 818 A.2d 780 (2003).

The issue of whether the plaintiff's injury occurred during the W24's safe and useful life was posed to the jury in a special interrogatory asking: "Do you find that the accident of January 8, 1994, occurred during the useful safe life of the W24?" The jury answered in the affirmative. Therefore, we must determine whether the record supported the jury's finding.

As a preliminary matter, we note that with respect to the factors set forth in § 52-577a (c), Case is incorrect in its suggestion that they are statutory requirements. Rather, the statute enumerates those factors as those a fact finder "may consider among other factors . . . ." General Statutes § 52-577a (c). The enumerated factors merely are guidelines to aid the fact finder in determining whether a product is within its safe and useful life.

The plaintiff's expert, O. John Zamparo, testified that wear and tear played no role in the plaintiff's injury. He asserted, rather, that the injury occurred because of a defect in the W24's design. The design defect, he stated, was the location of the fuel fill in close proximity to an unguarded fan blade. Zamparo further testified that the design of the W24, with regard to the fan blade, was unchanged from its design on the date of manufacture.

Additionally, the plaintiff testified that prior to his injury, he had used the W24 for loading sand and salt. After his injury, he continued to use the W24 for such things as snow removal and loading trucks until the W24 sustained engine trouble, at which time the plaintiff parked it in an outdoor storage lot, not wanting to alter it due to this litigation.

Case's expert, David H. Seaburg, an engineer employed by Case, testified[3] that the W24 model was available with an hour meter and that a W24 with 6000 hours of indicated use would still be within its normal life expectancy. He further testified that he inspected the plaintiff's W24 in 1998 and found that its meter had a reading indicating less than 6000 hours of use. He claimed, however, that he did not believe the hour meter was working because of the low number of hours indicated on the meter. Finally, he acknowledged that he did not test the meter to verify his assumption that it was not functioning properly.

On the basis of the foregoing evidence, the jury reasonably could have concluded that the plaintiff's W24 was within its safe and useful life at the time of the plaintiff's injury. Consequently, we find no abuse of discretion on the part of the court in refusing to set aside the verdict against Case based on § 52-577a.

II

Case next claims that the court improperly refused either to direct a verdict in its favor or to set aside the verdict against it on the question of design defect. Specifically, Case argues that the plaintiff failed to sustain his burden of proof under § 52-572m et seq. on his claim that the W24 was defective in its design. We disagree.

"Our standard of review of a directed verdict is well settled. A trial court should direct a verdict for a defendant if, viewing the evidence in the light most favorable to the plaintiff, a jury could not reasonably and legally reach any other conclusion than that the defendant is entitled to prevail." (Internal quotation marks omitted.) *Beecher* v. *Greaves*, 73 Conn. App. 561, 563, 808 A.2d

---

[3] Seaburg's deposition testimony was read into the record; he did not testify at the trial.

1143 (2002). "The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness. . . . In reviewing the action of the trial court in denying [a motion] . . . to set aside [a] verdict, our primary concern is to determine whether the court abused its discretion and we decide only whether, on the evidence presented, the jury could fairly reach the verdict [it] did." (Internal quotation marks omitted.) *Mazzacane* v. *Elliott*, 73 Conn. App. 696, 699, 812 A.2d 37 (2002).

Our Supreme Court thoroughly reviewed the topic of design defect strict liability claims in *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 694 A.2d 1319 (1997). In *Potter*, the court stated that "[p]roducts liability law has thus evolved to hold manufacturers strictly liable for unreasonably dangerous products that cause injury to ultimate users. Nevertheless, strict tort liability does not transform manufacturers into insurers, nor does it impose absolute liability. . . . [F]rom the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts. . . . Strict tort liability merely relieves the plaintiff from proving that the manufacturer was negligent and allows the plaintiff to establish instead the defective condition of the product as the principal basis of liability." (Citations omitted; internal quotation marks omitted.) Id., 210–11.

The court recognized that under the then existing test for design defect liability, the "consumer expectation" test, "a manufacturer is strictly liable for any condition not contemplated by the ultimate consumer that will be unreasonably dangerous . . . ." Id., 212. The court defined the term "unreasonably dangerous" to mean that "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordi-

nary consumer who purchases it, with the ordinary knowledge common to the community as to its [characteristics]." (Internal quotation marks omitted.) Id., 214–15, quoting 2 Restatement (Second), Torts § 402A, comment (i) (1965).

The court, additionally, incorporated a new test termed the "modified consumer expectation" test. That test evolved from a recognition "that there may be instances involving complex product designs in which an ordinary consumer may not be able to form expectations of safety. . . . In such cases, a consumer's expectations may be viewed in light of various factors that balance the utility of the product's design with the magnitude of its risks. . . . Thus, the modified consumer expectation test provides the jury with the product's risks and utility and then inquires whether a reasonable consumer would consider the product unreasonably dangerous." (Citations omitted; internal quotation marks omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 219–20.

The court further provided guidelines as to when a trial court should employ the consumer expectation test or the modified consumer expectation test. "[W]e do not require a plaintiff to present evidence relating to the product's risks and utility in every case. . . . There are certain kinds of accidents—even where fairly complex machinery is involved—[that] are so bizarre that the average juror, upon hearing the particulars, might reasonably think: Whatever the user may have expected from that contraption, it certainly wasn't that. . . . Accordingly, the ordinary consumer expectation test is appropriate when the everyday experience of the particular product's users permits the inference that the product did not meet minimum safety expectations. . . .

"Conversely, the jury should engage in the risk-utility balancing required by our modified consumer expecta-

tion test when the particular facts do not reasonably permit the inference that the product did not meet the safety expectations of the ordinary consumer. . . . Furthermore, instructions based on the ordinary consumer expectation test would not be appropriate when, as a matter of law, there is insufficient evidence to support a jury verdict under that test. . . . In such circumstances, the jury should be instructed solely on the modified consumer expectation test we have articulated today.

"In this respect, it is the function of the trial court to determine whether an instruction based on the ordinary consumer expectation test or the modified consumer expectation test, or both, is appropriate in light of the evidence presented. In making this determination, the trial court must ascertain whether, under each test, there is sufficient evidence as a matter of law to warrant the respective instruction." (Citations omitted; internal quotation marks omitted.) Id., 222–23.

Here, the court instructed the jury on the original consumer expectation test without objection from Case. Accordingly, our task is to determine whether a jury could have reasonably found that the W24's design was dangerous " 'to an extent beyond that which would be contemplated by the ordinary consumer . . . .' " Id., 214–15.

The jury heard the following evidence relevant to that determination. The plaintiff's hand slid into the engine area while he was refueling the W24 as the engine was running. He heard a "thump, thump" noise and, when he pulled his hand out, his fingers were injured. Zamparo testified that the fan blade was only seven inches from the fuel fill and that there was no guard to prevent the plaintiff's hand from coming into contact with the fan blade. Fischer testified that to a reasonable degree of medical probability, the plaintiff's injuries

were more likely than not caused by the engine fan blade.

The jury could reasonably have concluded that the proximity of the unguarded fan blade to the fuel fill was the result of an unreasonably dangerous design. Consequently, the court did not abuse its discretion in refusing to direct a verdict in favor of Case or to set aside the verdict against Case based on the question of design defect.

### III

Case next claims that the court improperly refused to grant its motion to set aside the verdict on the question of failure to warn. Case argues that the safety warnings distributed with the W24 were adequate to warn the plaintiff who, Case argues, was a sophisticated user. We are unpersuaded.

Claims premised on a failure to warn are based on General Statutes § 52-572q, which provides in relevant part: "(a) A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided. (b) In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions. (c) In claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm. . . ."

"The established rule in Connecticut is that [a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities. . . . Under such circumstances, the failure to warn, by itself, constitutes a defect." (Citations omitted; internal quotation marks omitted.) *Battistoni* v. *Weatherking Products, Inc.*, 41 Conn. App. 555, 562, 676 A.2d 890 (1996).

When Case first distributed the W24 in 1969, it provided a manual that warned against refueling the W24 when the engine is hot or running. The plaintiff testified, however, that when he purchased the W24 from Eastern, he did not receive a manual. He also testified that if he had received such a manual, he would not have refueled the W24 with its engine running, and, therefore, the accident would not have happened in the manner in which it had occurred. The plaintiff also stated that he had requested a copy of the manual from Eastern at the time of his purchase, but did not receive one until after the accident. When he finally received an operator's manual, it was for the 1973 model W24, and it contained no relevant warnings.

The plaintiff's expert, Zamparo, testified that upon his examination of the W24, he determined that there were no warnings on the equipment itself with respect to the dangers posed by the unguarded fan blade. He further testified that because of the proximity of the fan blade to the fuel fill and the absence of a guard, there should have been warnings placed on the inside of the engine compartment regarding the danger of attempting to fuel the W24 with its engine running.

On the basis of that evidence, we believe that the jury reasonably could have found that the plaintiff proved that if there had been adequate warnings in place at the time of the incident, he would not have been injured. Accordingly, the court did not abuse its

discretion in refusing to set aside the verdict against Case on that basis.

Also regarding the issue of warnings, Case contends that because the plaintiff was a sophisticated user, it had no obligation to warn him of the dangers of refueling the engine while it was running.

Section 52-572q (b) (2) recognizes that a sophisticated buyer may not need the same level of warning as an ordinary buyer would, and it directs that a fact finder may consider "the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm . . . ." This court further has recognized the sophisticated buyer defense to failure to warn claims. See *Sharp* v. *Wyatt, Inc.*, 31 Conn. App. 824, 847, 627 A.2d 1347 (1993) (" 'when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated' "), aff'd, 230 Conn. 12, 644 A.2d 871 (1994).

The plaintiff testified that he was an experienced contractor and that he was familiar with various types of off-road equipment. He knew the W24's engine contained moving parts and recognized that the fuel fill was in close proximity to the fan blade. The plaintiff further testified that the engine's moving parts could be dangerous and that the parts would be moving only while the engine was running.

We do not believe that that testimony, in and of itself, mandates a conclusion that the plaintiff is a "sophisticated user." His familiarity with off-road equipment did not necessarily instill in him the knowledge that this particular model loader would have an unguarded fan blade in close proximity to the fuel fill. Moreover, the factual determination of whether a purchaser is a sophisticated buyer must be viewed from the perspec-

tive of the manufacturer. In other words, the question for the jury was whether Case had reason to believe that the purchaser of its product would recognize the dangers associated with the product so as mitigate the duty of Case to warn. The record does not support Case's contention that the jury could not reasonably have concluded that the plaintiff was entitled to the reasonable warning due an ordinary consumer.

## IV

Case next claims that the court improperly admitted the opinion testimony of Zamparo, the plaintiff's expert. Specifically, Case claims that Zamparo failed to demonstrate any peculiar or special knowledge with regard to the W24, its design or usage and, as such, was not qualified to testify. We disagree.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Henry*, 72 Conn. App. 640, 654, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

Section 7-2 of the Connecticut Code of Evidence provides that "[a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

Our review of the record reveals no abuse of discretion on the part of the court in allowing Zamparo's testimony. Zamparo is a professional engineer, licensed by the state of Connecticut, who holds a mechanical engineering degree with a concentration in the automotive area. He has worked for Chrysler and completed a two year graduate program during that employment, receiving his master's degree in automotive engineering in 1957. Zamparo has been employed as an engineer for more than forty-eight years and has significant experience in product safety and machine design areas, including consultations involving off-road equipment. Those and other numerous credentials demonstrate that Zamparo can fairly be said to have a " 'special skill or knowledge directly applicable to a matter in issue' "; *State* v. *Henry*, supra, 72 Conn. App. 654; that his " 'skill or knowledge is not common to the average person' "; id.; and that his " 'testimony [was] helpful to the court or jury in considering the issues.' " Id. The court did not abuse its discretion in admitting Zamparo's expert testimony.

V

Case next claims that the court improperly admitted exhibits N, an operator's manual, and M, a parts catalog, submitted by the plaintiff. Specifically, Case claims that because those exhibits were from a later year's model and were different from those provided with the plaintiff's W24 at the time of its initial sale, they were irrelevant and their admission was prejudicial. We are not persuaded.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We

will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Mazzeo*, 74 Conn. App. 430, 434, 811 A.2d 775 (2003).

Outside of the jury's presence, the court held a hearing to determine the admissibility of exhibits M and N, the parts catalog and operator's manual the plaintiff purchased after his accident. During that hearing, Case stipulated that exhibit N was the operator's manual for the W24, published by Case in 1973. Additionally, Case stipulated that exhibit M was the parts catalog for the W24, published by Case in 1975.

The court admitted exhibits M and N as admissions on the part of Case. The operator's manual that accompanied the W24 when it was sold in 1969 had been admitted as exhibit three and contained a warning not to refuel the W24 while the engine is hot or running. Exhibits M and N did not contain any such warning. Case had asserted as a special defense that the plaintiff had misused the product, i.e., that he failed to obey the instructions provided to operators of the W24 and refueled the W24 without shutting off the engine. At trial, however, Case stipulated that exhibits M and N applied to the W24 on which the plaintiff was injured. The plaintiff offered exhibit M in response to the defense of misuse raised by Case on the ground that the absence of any warning in the 1973 manual was some evidence that Case no longer thought in 1973 that refueling the W24 with its engine running was dangerous. Under those circumstances, we believe the court did not abuse its discretion and ruled properly in admitting exhibits M and N.

## VI

Case's final claim is that the court improperly instructed the jury on the issues of warnings and proximate cause. Specifically, Case argues that the court abused its discretion in failing to charge the jury as to the plaintiff's burden under § 52-572q (c) and as to his burden of establishing proximate cause. We disagree.

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which they might find to be established . . . and therefore, we have stated that a charge must go beyond a bare statement of accurate legal principles to the extent of indicating to the jury the application of those principles to the facts claimed to have been proven. . . .

"When reviewing the challenged jury instruction, however, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Davis*, 261 Conn. 553, 563–64, 804 A.2d 781 (2002).

With respect to § 52-572q (c), Case claims that the court's charge did not identify the specific burden placed on the plaintiff, i.e., that "the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claim-

ant would not have suffered the harm." General Statutes § 52-572q (c).

The court instructed the jury in relevant part that "[t]he party who makes the claim has the burden of proof with respect to that claim. The plaintiff has the burden of proving each essential element of its complaint. The defendants do not have to present evidence to disprove any of the plaintiff's claims. . . . In order to recover from [Case or Eastern], the *plaintiff has the burden of proving* both that when that defendant sold the wheel loader, or W24, that machine was in a defective condition and *that that defective condition or defect caused injury to the plaintiff.* . . . A product seller is liable to a plaintiff who suffers injury from the use of a product if the product could not be used safely by the ordinary consumer without adequate warnings or instructions." (Emphasis added.) We believe that that quoted portion of the jury instructions clearly conveys the plaintiff's burden of proof with respect to a failure to warn claim under § 52-572q (c).

Case further claims that the court failed to instruct the jury adequately on the element of proximate cause with respect to the design defect. The court charged the jury in relevant part as follows: "In order to prevail against the defendant . . . the plaintiff must also prove that the design defect existed at the time the W24 left [the defendant]. . . . A product seller is not liable if another person alters a product in a way that creates a defect unless the product seller expected or reasonably should have expected an alteration to occur. . . . If you find that the harm would have occurred notwithstanding any alterations, then the defendant . . . may not be excused from liability on the grounds that the W24 was altered." We believe that portion of the court's charge clearly conveys the burden on the plaintiff to prove that the design defect proximately caused his injury.

Case's final claim with respect to the jury instructions is that the court improperly failed to instruct the jury that a product seller is not liable for failure to provide a warning if the plaintiff is aware of the danger.

The court instructed the jury in relevant part as follows: "In deciding whether warnings or instructions were necessary, you are to consider first the likelihood that the W24 would cause the type of harm suffered by the plaintiff. Second, *the ability of a defendant to anticipate at the time it put the W24 into the stream of commerce that an expected user would be aware of the risks involved in using the W24 and of the nature of the potential harm.* And, third, the technological feasibility and cost of warnings and instructions." (Emphasis added.) That instruction not only conveys the considerations set forth in § 52-572q (b), but also is sufficient to convey the notion that a plaintiff may not recover if the defendant reasonably anticipated that a W24 purchaser, such as the plaintiff, could be expected to be aware of the danger posed by the W24. The court's instruction was not deficient.

The judgment is affirmed.

In this opinion the other judges concurred.